# In the United States Court of Federal Claims

No. 10-587C
Filed March 29, 2011
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (2006) (standard of review); |
| | Administrative Record; |
| | Bid Protest Jurisdiction, 28 U.S.C. § 1491(b)(1) (2006); |
| | Competition in Contracting Act, 31 U.S.C. § 3553(c) (2006) (GAO stay of procurement); |
| WATTERSON CONSTRUCTION COMPANY, | Federal Acquisition Regulations, |
| | 48 C.F.R. §§ 14.302(a), 14.304(b)(1) (late proposals); |
| Plaintiff, | 48 C.F.R. § 15.208(b)(1) (late proposals); |
| v. | 48 C.F.R. § 15.306(e) (bid submissions); |
| THE UNITED STATES, | 48 C.F.R. § 15.307 (proposal revisions); |
| | 48 C.F.R. §§ 52.212-1(f)(2)(i), 52.214-23(b)(1), 52.214-7(b), 52.215-1(c)(3) (exceptions to late proposals); |
| Defendant. | 48 C.F.R. § 52.215-1(c)(6) (emergency or unanticipated event exception to late proposal). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM OPINION AND ORDER**

**S. Lane Tucker,** Stoel Rives LLP, Anchorage, Alaska, Counsel for Plaintiff.

**Lauren Springer Moore**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**BRADEN,** *Judge.*

## I.   RELEVANT FACTUAL BACKGROUND.[1]

On July 27, 2009, the Army Corps of Engineers ("Army Corps") issued Request For Proposals No. W911KB-09-R-0011 FTW336B ("the July 27, 2009 RFP") for the design and construction of a standard barracks to house 294 persons in Fort Wainwright, Alaska. AR 7, 12. This procurement had two phases. AR 3. In the first phase, the Army Corps evaluated offerors' performance capability. AR 28. In response, four offerors submitted proposals, but only Watterson Construction Company ("Watterson"), Kiewit Building Group, Inc. ("Kiewit"), and Walsh Construction Company of Chicago ("Walsh") were invited to proceed to the second phase. AR 396, 405. In the second phase, the Contracting Officer ("CO") evaluated another round of proposals and was authorized to award a firm fixed-price contract to the offeror that submitted a proposal that conforms to the July 27, 2009 RFP, was "fair and reasonable, and offers the best value to the Government." AR 51.

On November 30, 2009, the Army Corps issued Amendment No. 0007, requesting that the aforementioned firms submit final proposals by December 18, 2009. AR 271-85. In response, Watterson, Kiewit, and Walsh submitted final proposals, and the CO notified Watterson on January 25, 2010 that it was the "apparent successful offeror." AR 375. On February 5, 2010, however, the CO informed Watterson that a "problem" arose. AR 377. On February 12, 2010, the Army Corps issued Amendment No. 0008, allowing all three firms to submit revised proposals by February 19, 2010 at 12:00 p.m. AR 286. Again, Watterson, Kiewit, and Walsh submitted revised proposals, but the Army Corps took no action, because of "a slight delay in receiving authority to award"; the proposals expired March 12, 2010. AR 287, 377. On March 12, 2010, the Army Corps issued Amendment No. 0009 requesting a second set of proposal revisions by March 16, 2010 at 12:00 p.m. AR 288.

On March 16, 2010 at 11:01-11:02 a.m., Watterson sent its second revised proposal by e-mail to the CO's e-mail address. AR 386, 412, 414. At 11:29 a.m., this e-mail proposal was "received" by gw4.usace.army.mil, the first of four Army Corps servers, located "directly behind a [Corps] firewall facing the Internet." AR 386, 414, 417. Watterson's e-mail proposal, however, did not "arrive" in the assigned CO e-mail inbox until 12:04 p.m., four minutes after the revised date/time due. AR 386, 414, 416.[2] The Administrative Record evidences that the delay between the receipt of Watterson's e-mail proposal at the Army Corps servers at 11:29 a.m. and actual delivery to the CO's e-mail inbox at 12:04 p.m. was caused by an unexplained "mail storm"[3] at the Army Corps e-mail servers. AR 415.[4]

---

[1] The facts herein were derived from the September 14, 2010 Administrative Record ("AR 1-444").

[2] A different Army Corps log indicates that Watterson's March 16, 2010 11:01-11:02 a.m. e-mail was "successfully delivered" on March 16, 2010 at 19:01:50 EST. AR 419.

[3] A "mail storm" is an "e-mail sent to a large number of users, a sufficient number of whom reply to all, flooding an e-mail system and disabling it." AR 417.

While Watterson's March 16, 2010 11:01-11:02 a.m. e-mail was delayed at the Army Corps server, the CO sent Watterson an e-mail "to remind [it] that proposal modifications were due at 12:00 p.m. and that they could be e-mailed in." AR 405. Shortly after 12:00 p.m., Watterson's Executive Vice President called the CO to inform her that Watterson's proposal was sent by e-mail no later than 11:02 a.m. AR 405. During this discussion, Watterson's e-mail proposal was delivered to the CO's e-mail inbox and the CO confirmed receipt. AR 405. On that same day around 12:20 p.m., Watterson also provided the CO with a hard copy of the second revised proposal. AR 405.

On March 18, 2010, the CO decided that, because Watterson's and Walsh's proposals did not arrive in the CO's e-mail inbox until after the 12:00 p.m. deadline, both were late and must be eliminated from consideration. AR 405-06.

On March 19, 2010, the Army Corps informed Watterson that the March 16, 2010 revised e-mail proposal was considered late. AR 411. In response, on March 21, 2010, Watterson sent a letter to the CO objecting to this decision. AR 411.

On March 22, 2010, the Army Corps sent a letter to inform Watterson that, because Watterson's proposal was late, it was deemed "incomplete" and "ineligible for award." AR 393, 411.

Since Kiewit was the only remaining offeror, the CO "determined that discussions should be reopened to address some issues with [Kiewit's] technical solution." AR 438. On March 22, 2010, the Army Corps informed Kiewit of "the items of their proposal that were considered to be weaknesses, deficiencies, and uncertainties." AR 438.

---

[4] As an Army Corps IT specialist recalled:

> Watterson's e-mail hit our e-mail gateway at 11:29 a.m.[,] but was delayed delivery[,] because of the mail storm we had on that particular day meaning that our internal gateway servers were flooded with e-mail as a result of a customer in HQ forwarding a message to several DLL's and shouldn't have. With so many people replying back to the message and or forwarding the message on to other DLL's caused the corps bridgehead e-mail servers to temporarily come to a crawl while they dwelt [sic] with such a mass amount of e-mails. It was certainly something we don't normally see.

AR 415.

The "mail storm" also delayed the delivery of Walsh's revised proposal that was sent to the CO by e-mail on March 16, 2010 at 11:43 a.m., but not received at the CO's e-mail inbox until 12:40 p.m. AR 405, 438.

## II. PROCEDURAL HISTORY.

### A. Before The Government Accountability Office.

On March 24, 2010, Watterson filed a pre-award bid protest at the Government Accountability Office ("GAO"). AR 312. On March 26, 2010, Watterson withdrew that protest. AR 310.[5] On April 1, 2010, the GAO confirmed the withdrawal of Watterson's March 24, 2010 protest. AR 306.[6]

### B. Before The United States Court Of Federal Claims.

On August 31, 2010, Watterson filed a Complaint ("Compl.") in the United States Court of Federal Claims, alleging: the Army Corps' rejection of Watterson's March 16, 2010 revised proposal violated 48 C.F.R. §§ 52.215-1(c)(3), (6) (2010); the Army Corps provided Watterson with incomplete and inaccurate information, "causing [Watterson] to act to its detriment . . . forgoing its GAO protest and the automatic stay of award" provided by the Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. § 3553(c)(1) (2006); and Kiewit unlawfully was allowed to modify its proposal in violation of 48 C.F.R. §§ 15.306(e), 15.307 (2010). Compl. ¶¶ 56-64. Watterson requested declaratory relief, award of "bid preparation and proposal costs," and "its costs and attorney's fees in this action as allowed by law." Compl. ¶¶ 65-71. In addition, Watterson filed Exhibits ("Pl. Ex. A-Q") and an August 27, 2010 Declaration of Mr. James E. Watterson, Executive Vice President ("Watterson Decl.").

On September 14, 2010, the Government filed the Administrative Record ("AR 1-444"). On October 1, 2010, Watterson filed a Motion For Judgment On The Administrative Record ("Pl. Mot."), together with attached Exhibits ("Pl. Ex. 1-6"). On November 1, 2010, the Government filed a Cross Motion For Judgment On The Administrative Record and Response to Watterson's October 1, 2010 Motion ("Gov't Mot."). On December 1, 2010, Watterson filed a Reply and Response to the Government's November 1, 2010 Cross Motion and Response ("Pl. Rep."). On December 14, 2010, the Government Filed a Reply to Watterson's December 1, 2010 Response ("Gov't Rep.").

---

[5] Later on March 26, 2010, the Army Corps issued Amendment No. 0010 to the July 27, 2009 RFP to allow Kiewit to submit a modified proposal. AR 297, 302-3. On April 5, 2010, Kiewit agreed to make several changes, but proposed a new price of $38,384,000, an increase of $5.582 million above Kiewit's March 16, 2010 proposal. AR 438.

[6] On April 9, 2010, the Army Corps informed Watterson that its proposal received an overall rating of "Excellent," whereas Kiewit, the successful offeror, only was rated "Acceptable." AR 396. In addition, Watterson was advised that the Kiewit's final price was $2 million more than Watterson's. AR 396. On April 9, 2010, the Army Corps notified Watterson that the company was entitled to a $70,000.00 "stipend," pursuant to Section 00 22 20 of the July 27, 2009 RFP. AR 51, 394, 396-404. The Administrative Record does not reflect whether Watterson accepted the $70,000.00 stipend.

### III. DISCUSSION.

#### A. Jurisdiction.

Count I of the August 31, 2010 post-award bid protest Complaint alleges that the Army Corps' rejection of Watterson's proposal as "late" violated Federal Acquisition Regulation ("FAR") 52.215-1(c)(3)(ii)(A)[7] and FAR 52.215-1(c)(6).[8]  Compl. ¶¶ 56-60.  Count I also alleges that the Army Corps provided Watterson with misleading information that Watterson relied on when it withdrew the March 24, 2010 GAO protest and request for an automatic stay, pursuant to the CICA, 31 U.S.C. § 3553(c)(1).[9]  Compl. ¶ 61.  Count II alleges that the Army Corps allowed Kiewit to modify its design and price in violation of FAR 15.306(e)[10] and FAR 15.307.[11]  Compl. ¶¶ 62-64.

---

[7] FAR 52.215-1(c)(3)(ii)(A) provides:

(ii)(A) Any proposal, modification, or revision received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and—

(1) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or

(2) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

(3) It is the only proposal received.

48 C.F.R. § 52.215-1(c)(3)(ii)(A).

[8] FAR 52.215-1(c)(6) provides: "Offerors may submit modifications to their proposals at any time before the solicitation closing date and time, and may submit modifications in response to an amendment, or to correct a mistake at any time before award."  48 C.F.R. § 52.215-1(c)(6).

[9] The CICA, 31 U.S.C. § 3553(c)(1), provides: "[A] contract may not be awarded in any procurement after the [f]ederal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending."  31 U.S.C. § 3553(c)(1).

[10] FAR 15.306(e)(2) prohibits the government from revealing "an offeror's technical

5

The United States Court of Federal Claims has jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1) (2006):

> to render judgment on an action by an interested party objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement.

*Id.*

Since the August 31, 2010 Complaint alleged sufficient facts to establish a claim for proposal preparation costs under 28 U.S.C. § 1491(b)(1), the court has determined that it has jurisdiction to adjudicate those claims.

### B. Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with the definition of "interested party" provided in the CICA, 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" to convey standing under 28 U.S.C. § 1491(b)(1)). A two-part test is applied to determine whether a protester is an "interested party," a protestor must establish that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Solutions, Inc.* v. *United States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008).

A protestor also must show that the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc.* v. *United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal quotation marks omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). A party demonstrates prejudice when "it can show that but for the error, it would have had a

---

solution, including unique technology, innovative and unique uses of commercial items, or any information that would compromise an offeror's intellectual property to another offeror." 48 C.F.R. § 15.306(e)(2).

[11] FAR 15.307(a) provides: "If an offerors proposal is eliminated or otherwise removed from the competitive range, no further revisions to that offeror's proposal shall be accepted or considered." 48 C.F.R. § 15.307(a).

substantial chance of securing the contract." *Labatt,* 577 F.3d at 1378.  Importantly, a proper standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error.  *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

The August 31, 2010 Complaint alleged sufficient facts to establish that Watterson is an "interested party," *i.e.*, was an offeror with a direct economic interest in the July 27, 2009 RFP, as amended.  As to prejudice, the Complaint also alleges that the Army Corps improperly eliminated Watterson's e-mail proposal as "late" and, but for this error, Watterson had a substantial chance of being awarded the contract, particularly since Watterson's proposal received a higher overall rating at a lower cost than the awardee's proposal.  AR 394, 396.

For these reasons, the court has determined that Watterson has standing to pursue this bid protest in the United States Court of Federal Claims.

### C. Standard Of Review On A Motion For Judgment On The Administrative Record.

Pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is required to review challenges to an agency decision, pursuant to the standards set forth in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) (2006) (The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Banknote Corp. of Am., Inc.* v. *United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'").  The United States Court of Appeals for the Federal Circuit has provided the trial courts with specific guidance in how to analyze each of these three APA standards.

First, the United States Court of Appeals for the Federal Circuit has held that a bid award may be set aside if "the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009).  The United States Court of Appeals for the Federal Circuit has clarified, however that when a contract award is challenged, based on regulatory or procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.* v. *United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotation marks omitted).

Second, if an award decision is challenged, pursuant to the rational basis test, the trial court "must sustain an agency action unless the action does not evince rational reasoning and

7

consideration of relevant factors." *Savantage Fin. Servs.* v. *United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) (internal alterations, quotation marks, and citations omitted); *see also Centech Grp., Inc.* v. *United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.").

Third, when a disappointed bidder challenges a federal agency for acting in an arbitrary or capricious manner, the court may set aside the procurement, but "only in extremely limited circumstances." *United States* v. *John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evidences that the agency "considered the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke . . . highly deferential rational basis review. . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotation marks and citations omitted).

In addition, on a motion for judgment on the administrative record, the court is required to determine whether the plaintiff has met its burden of proof to show that the relevant federal agency decision was without a rational basis or not in accordance with the law. *Weeks Marine*, 575 F.3d at 1348 (instructing the trial court to make "factual findings under RCFC [52.1][12] from the [limited] record evidence as if it were conducting a trial on the record"); *see also Afghan Am. Army Servs. Corp.* v. *United States*, 90 Fed. Cl. 341, 355 (2009) ("In reviewing cross-motions for judgment on the administrative record, the court must determine 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'") (citations omitted). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. *See Bannum* v. *United States*, 404 F.3d 1346, 1353-54 (2005) ("RCFC [52.1] requires the [United States] Court of Federal Claims, when making a prejudice analysis in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record.").

### D. Issues Raised By Plaintiff's Motion For Judgment On The Administrative Record.

Count I of the August 31, 2010 post-award bid protest Complaint alleges that the Army Corps incorrectly determined that Watterson's proposal was late. Compl. ¶¶ 56-60. Count I also alleges that the Army Corps provided Watterson with misleading information causing Watterson

---

[12] A motion for judgment on the administrative record, pursuant to RCFC 52.1, is akin to an expedited trial on the Administrative Record and has no counterpart in the Federal Rules of Civil Procedure. *See Bannum* v. *United States*, 404 F.3d 1346, 1356 (2005) ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."); *see also* RCFC 52.1, Rules Committee Note (July 13, 2009).

to withdraw its March 24, 2010 GAO protest. Compl. ¶ 61. Count II alleges that the Army Corps improperly allowed Kiewit to modify its design and price. Compl. ¶¶ 62-64. This Memorandum Opinion and Order considers only whether the Army Corps improperly rejected Watterson's proposal as late, since Watterson's other allegations were not discussed in its October 10, 2010 Motion for Judgment on the Administrative Record nor in its December 1, 2010 Response.

        **1.**        **Whether Plaintiff's March 16, 2010 E-Mail Proposal Was "Late."**

            **a.**        **The Plaintiff's Argument.**

The Army Corps' March 12, 2010 Amendment No. 0009 provided that phase 2 revisions were "due on March 16, 2010 at 12:00 PM [noon] Alaska Time." AR 288. The Administrative Record evidences that Watterson's March 16, 2010 e-mail proposal was received by the Army Corps' server no later than 11:29 a.m., and perhaps as early as 11:01 a.m. AR 412, 416, 419. The fact that it did not arrive in the CO's e-mail inbox until March 16, 2010 at 12:04 p.m. was not Watterson's fault. Pl. Mot. at 14-15; Pl. Rep. at 3.

In non-electronic commerce cases, the GAO has determined that the Government receives a bid at the time the bidder relinquishes control. *See Weeks Marine*, *Inc.*, B-292758, 2003 CPD ¶ 183 (Comp. Gen. Oct. 16, 2003) ("[I]n order for the government to receive a bid, a bidder must relinquish control of the bid to the government (*i.e.*, by transferring it to an appropriate official or by placing it in [an] officially designated location for the submission of bids such as a bid depository box)."). Accordingly, if Watterson's proposal had been sent "by regular mail and received at the designated Army Corps P.O. Box by the deadline or had Watterson's proposal been sent by express mail and arrived at the designated street address by the deadline, those proposals would have been considered timely[,] even though they had not arrived at [the CO's] desk by the appointed time." Pl. Mot. at 12 n.15.

Watterson argues that the "designated office" in this case either was the CO's physical Post Office Box address or the CO's e-mail address. Pl. Rep. at 3 (citing AR 14-15, 269-70, 366). Watterson also emphasizes that there was no express requirement in the Solicitation that *the CO actually receive* proposals by March 16, 2010 at 12:00 p.m. Pl. Mot. at 11. Sending an e-mail proposal to the Army Corps designated e-mail address was analogous to an offeror's placing a proposal in a depository box or a P.O. Box, rendering actual possession by the CO unnecessary for the bid to be timely. Pl. Mot. at 12, 14; *see also California Marine Cleaning* v. *United States*, 42 Fed. Cl. 281, 297 (1998) ("A timely bid does not become late simply because the [G]overnment overlooks the bid in a bid box . . . ."). Therefore, whether the CO in this case could physically access the e-mail bid is irrelevant, because the proper inquiry is to ascertain when the offeror relinquished control over the proposal. Pl. Mot. at 15-16 (citing *Haskell Co.*, B-292756, 2003 CPD ¶ 202 (Comp. Gen. Nov. 19, 2003) ("A proposal is received at the time that the offeror relinquishes control to the [G]overnment. . . . [The offeror's] messenger relinquished control of [the offeror's] proposal package to the designated contracting official by placing it on her desk in her presence. . . . The fact that the contracting official may not have picked up the package [until one minute after the deadline] is irrelevant since an individual may

gain effective control over an item without actually taking it into his or her hands.")); *see also Matter of Leland and Melvin Hopp*, B-211128, 84-2 CPD ¶ 410 (Comp. Gen. Feb. 15, 1984) ("[A]lthough the . . . bid [previously stored in the Agency's locked safe] was not discovered until after bid opening, it was timely received and was not a late bid.").

### b.     The Government's Response.

The Government's response is that the "Government office designated in the solicitation" was the CO's office or the CO's e-mail inbox. Gov't Mot. at 10; AR 380. Since Watterson's e-mail proposal was not delivered to the CO's e-mail inbox until 12:04 p.m., it was late. Gov't Mot. at 11. Delivery to an agency's gateway server is not analogous to depositing a proposal in a designated box, because the CO could not see or access the proposal until it physically was delivered to the CO's e-mail inbox. Gov't Resp. at 3.

### c.     The Court's Resolution.

The threshold issue in this case is whether Watterson's revised proposal was late. FAR 52.215-1(c)(3)(i-ii), the governing regulation, provides:

> Offerors are responsible for submitting proposals, and any modifications or revisions, *so as to reach the Government office designated in the solicitation by the time specified* in the solicitation. . . . Any proposal, modification, or revision, *received at the Government office* designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered . . . .

48 C.F.R. § 52.215-1(c)(3)(i)-(ii) (emphasis added).[13]

Therefore, to ascertain whether a proposal is "late," the court must determine: what is the "Government office designated in the solicitation"; what time the solicitation specified; and whether the proposal "reached" or was "received" by the designated Government office in specified time. *Id.*

As to the first element, the July 27, 2009 RFP provided that proposals "will be received until the date and time specified" at either a P.O. Box address or a physical street address. AR 14-15. The RFP did not encourage hand delivery because of "heightened security." AR 14. Significantly, the RFP anticipated that at least the date and time could change by "subsequent amendment." AR 14. Amendments 0001-0006 made no changes to the designated Government office. AR 231-57. On August 17, 2009, however, Amendment 0007 provided that revised proposals could be submitted either by express mail delivery to a physical street address or to the CO's e-mail, Donna.L.West@usace.army.mil. AR 263. The cover letter to Amendment 0008 provided: "Please submit your response no later than February 19, 12:00 p.m., Alaska time to the

---

[13] The following FAR provisions include late proposal rules that are nearly identical: 48 C.F.R. §§ 14.304 (2010), 15.208 (2010), 52.212-1 (2010), 52.214-23 (2010), 52.214-7 (2010).

attention of Donna West by e-mail to Donna.L.West@usace.army.mil." AR 283. The cover letter did not indicate that offerors could submit proposals by methods other than e-mail. *Id.* Amendment 0009 did not change the instructions of Amendment 0008 other than to provide: "Please mark the outside of envelope which proposal is submitted to show Amendments received." AR 288. This could be read to suggest that proposals be sent to the physical address in an envelope, although an e-mail proposal could contain the required acknowledgment of the Amendment, suggesting that an e-mail response would be acceptable. The cover letter to Amendment 0009 was an e-mail. AR 383. Since neither Amendment 0009 nor its cover letter changed the prior instructions in Amendment 0007 to send revised proposals to the CO's e-mail address, the court has determined that the "Government office designated in the solicitation," as amended, was the CO's e-mail address.

As to the second element, there is no dispute that the "time specified in the solicitation," as amended, was March 16, 2010 at 12:00 p.m., Alaska Time. AR 288.

As to the third element, *i.e.*, whether the proposal "reached" or was "received" at the designated Government office within the specified time, the United States Court of Federal Claims has considered the timeliness of proposals in two other cases. *See Conscoop–Consorzia Fra Cooperative Di Prod. E Lavoro* v. *United States*, 62 Fed. Cl. 219, 238 (2004), *aff'd* 159 Fed. Appx. 184 (Fed. Cir. 2005); *California Marine Cleaning*, 42 Fed. Cl. at 298. Neither these cases, nor any precedent of the United States Court of Appeals for the Federal Circuit, has reconciled the text in FAR 52.215-1(c)(3)(i-ii) that first speaks to a proposal being sent "so as to *reach* the Government office," but subsequently uses the phrase "*received* at the Government office." The verb "reach" is defined as "to arrive at." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1035 (11th ed. 2003). In contrast, "received" means "to come unto possession of." *Id.* at 1038. In any case, the distinction between "reach" and "receive" is not dispositive, because the proposal was both reached and received by the Government's e-mail servers before the due date. AR 412, 414, 417. Therefore the proposal reached the Government office designated in the Solicitation by the time specified therein. Accordingly, the court has determined that Watterson's March 16, 2010 proposal submitted by e-mail was not late.[14]

>    2.   **Assuming, *Arguendo*, That Plaintiff's March 16, 2010 E-Mail Proposal Was Late, Whether FAR 52.215-1(c)(3)(ii) Excuses That Lateness.**
>
>         a.   **The Plaintiff's Argument.**

Assuming, *arguendo*, that Watterson's e-mail proposal was late, Watterson argues that it should have been excused under the "Government Control" exception set forth in FAR 52.215-

---

[14] Although the court followed the precise language of FAR 52.215-1(c)(3)(i)-(ii), if this rule is reconsidered, the court suggests that lateness for e-mail proposals should be determined based on when the sender relinquishes control of the e-mail proposal, instead of when it reaches or is received by the responsible government official's e-mail.

1(c)(3)(ii)(A)(2),[15] despite the fact that the GAO previously has determined that the "Government Control" exception does not apply to e-mail proposals.[16] Pl. Mot. at 30. Watterson contends that these GAO decisions disregard the plain meaning of FAR 52.215-1(c)(3)(ii)(A), because either the "Electronic Commerce" exception[17] or the "Government Control" exception may be applied to electronic proposals. Pl. Mot. at 22.

Watterson asserts that the regulatory history of the late proposal exceptions in the FAR support this reading. Pl. Mot. at 19. Specifically, in 1995, the FAR regulations governing late proposals were located in 48 C.F.R. § 52.215-10. *See* 54 FED. REG. 48,978, 48,994 (Nov. 28, 1989), 60 FED. REG. 34,735, 34,738 (July 3, 1995) (codified at 48 C.F.R. § 52.215-10). At that time, the FAR recognized five exceptions that excused late proposals, including an "Electronic Commerce" exception and an "Only Proposal" exception.[18] *Id.* Each of these exceptions was tied to a specific method of delivery, except for the "Only Proposal" exception. *Id.*

In 1997, the so-called "Late Proposal Rule" was moved from 48 C.F.R. § 52.215-10 to 48 C.F.R. § 52.215-1(c)(3). *See* 62 FED. REG. 51,223, 51,259-51,260 (Sept. 30, 1997). The 1997 version, set forth below in its entirety, included all of the five pre-1997 exceptions and added a "Government Control" exception (E):

> (i) Any proposal received at the office designated in the solicitation after the exact time specified for receipt of offers will not be considered unless it is received before award is made and—

---

[15] The "Government Control" exception allows for consideration of a late proposal if there is "acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers." 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2).

[16] *See, e.g.*, *Alamiah Tech. Grp.*, 402707.2, 2010 CPD ¶ 148 (Comp. Gen. June 29, 2010); *Urban Title, LLC*, B-311437.3, 2009 CPD ¶ 31 (Comp. Gen. Jan. 7, 2009); *Symetrics Indus., LLC*, B-298759, 2006 CPD ¶ 154 (Comp. Gen. Oct. 16, 2006); *Sea Box, Inc.*, B-291056, 2002 CPD ¶ 181 (Comp. Gen. Oct. 31, 2002) (cited with approval by United States Court of Federal Claims in *Conscoop–Consorzia*, 62 Fed. Cl. at 239-40 (2004)).

[17] The "Electronic Commerce" exception allows for consideration of a late proposal that was "transmitted through an electronic commerce method authorized by the solicitation, [if] it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals." 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(1). Watterson concedes that the "Electronic Commerce" exception is inapplicable, because Watterson's bid was not received by the Army Corps' servers by 5 p.m., the day before proposals were due. Pl. Mot. at 30.

[18] The "Only Proposal" exception allows for consideration of a late proposal if it is "the only proposal received." 54 FED. REG. at 48,994.

>(A) It was sent by registered or certified mail not later than the fifth calendar day before the date specified for receipt of offers (e.g., an offer submitted in response to a solicitation requiring receipt of offers by the 20th of the month must have been mailed by the 15th);
>
>(B) It was sent by mail (or telegram or facsimile, if authorized) or hand-carried (including delivery by a commercial carrier) if it is determined by the Government that the late receipt was due primarily to Government mishandling after receipt at the Government installation;
>
>(C) It was sent by U.S. Postal Service Express Mail Next Day Service-Post Office to Addressee, not later than 5:00 p.m. at the place of mailing two working days prior to the date specified for receipt of proposals. The term "working days" excludes weekends and U.S. Federal holidays;
>
>(D) It was transmitted through an electronic commerce method authorized by the solicitation and was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or
>
>(E) There is acceptable evidence to establish that it was received at the activity designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers, and the Contracting Officer determines that accepting the late offer would not unduly delay the procurement; or
>
>(F) It is the only proposal received.

*Id.*

The 1997 version of the FAR provided four "safe harbor" provisions applicable to five delivery methods, *i.e.*, hand-delivery, facsimile, telegram, certified or registered mail, and electronic commerce. Pl. Mot. at 19; 62 FED. REG. at 51,259-51,260. In addition, the "Government Control" exception and the "Only Proposal" exception were intended to be applicable regardless of the method of delivery. Pl. Mot. at 19; 62 FED. REG. at 51,259-51,260. Therefore, Watterson reasons that if *Sea Box* were correct that the "Government Control" exception only applies in the absence of a "safe harbor" provision, then between 1997 and 1999, the "Government Control" exception would be unnecessary since the FAR contained "safe harbor" provisions for every possible method of delivery. Pl. Mot. at 20; Pl. Rep. at 9. Accordingly, *Conscoop-Consorzia*, 62 Fed. Cl. 219, and *Seabox*, B-291056, 2002 CPD ¶ 181 (Comp. Gen. Oct. 31 2002), were wrongly decided, and would have been resolved differently if they had addressed the regulatory history. Pl. Mot. at 23 n.23.

Watterson reads the current version of the FAR to apply the "Electronic Communication" exception to "information on the Proposer's side of the Government firewall," while the "Government Control" exception addresses "the risks and available information on the Government's side of its firewall."[19] Pl. Mot. at 28.

### b.  The Government's Response.

The Government responds that the "Government Control" exception does not apply to proposals submitted by e-mail. Gov't Mot. at 14-15 (citing *Conscoop–Consorzia*, 62 Fed. Cl. at 239-40);[20] *see also Sea Box*, B-291056, 2002 CPD ¶ 181 (Comp. Gen. Oct. 31 2002). Therefore, the court should adopt the GAO's *Sea Box* construction of the "Government Control" exception, because it does not disregard the plain meaning of the FAR and gives effect to all FAR provisions. Gov't Rep. at 4. The Government also disputes that the "Government Control" exception was a "dead letter" between 1997 and 1999, because it still applied to non-electronic communications. *Id.*

### c.  The Court's Resolution.

Assuming, *arguendo*, that Watterson's e-mail proposal was "late," FAR 52.215-1(c)(3)(ii)(A)(2) excuses "late" proposals, when there is "acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers." FAR 52.215-1(c)(3)(ii)(A)(2). This exception does not by its express terms exclude proposals submitted by e-mail. *Id.*

Here, the regulatory history is instructive. *See Roberto* v. *Dep't of Navy,* 440 F.3d 1341, 1350 (Fed. Cir. 2006) (when the plain meaning of the regulation is clear, "no further inquiry is required into agency interpretations or the regulatory history to determine its meaning"). As of December 28, 1989, late proposals were governed by FAR 52.215-10,[21] including three

---

[19] "*Firewalls* are devices or programs that control the flow of network traffic between networks or hosts that employ differing security postures. . . . [M]any enterprise networks employ firewalls to restrict connectivity to and from the internal networks used to service more sensitive functions, such as accounting or personnel." National Institute of Standards and Technology, U.S. Department of Commerce, *Guidelines on Firewalls and Firewall Policy*, 2-1 (Sept. 2009), *available at* http://csrc.nist.gov/publications/nistpubs/800-41-Rev1/sp800-41-rev1.pdf.

[20] *Conscoop–Consorzia*, however, is inapplicable, because the e-mail at issue in that case did not arrive at the Government's servers until after the proposal deadline, so the "Government Control" exception did not apply. *Conscoop–Consorzia*, 62 Fed. Cl. at 240. That was not the case here. AR 386, 414, 417.

[21] The 1989 late proposal rule provided:

(a) Any proposal received at the office designated in the solicitation after the

exceptions based on the method that the proposal was submitted, and a fourth exception to allow an agency to consider a late proposal, if it was the only proposal received. *See* 54 FED. REG. 48,978, 48,993 (Nov. 28, 1989) (codified at 48 C.F.R. § 52.215-10).

On December 30, 1993, a FAR amendment was proposed "to remove any barriers to the use of Electronic Data Interchange (EDI)[22] in Government Contracting." 58 FED. REG. 69,588, 69,591 (proposed Dec. 30, 1993) (to be codified at 48 C.F.R. § 52.215-10). Under this rule, late proposals submitted by EDI could be excused either under the "Government Mishandling" or "Only Proposal" exceptions. *Id.* This amended rule, however, was never promulgated.

On March 6, 1995, another rule was proposed to address "the use of electronic commerce/electronic data interchange in Government contracting." 60 FED. REG. 12,384, 12,384 (proposed Mar. 6, 1995). This proposed rule would amend FAR 52.215-10 to include an "Electronic Commerce" exception to allow consideration of a late proposal that was "transmitted through an electronic commerce method authorized by the solicitation and was received by the Government not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals." *Id.* at 12,389 (to be codified at 48 C.F.R. § 52.215-10). The rule, however, was

---

exact time specified for receipt will not be considered unless it is received before award is made and it—

(1) Was sent by registered or certified mail not later than the fifth calendar day before the date specified for receipt of offers (e.g., and offer submitted in response to a solicitation requiring receipt of offers by the 20th of the month must have been mailed by the 15th);

(2) Was sent by mail or, if authorized by the solicitation, was sent by telegram or via facsimile and it is determined by the Government that the late receipt was due solely to mishandling by the Government after receipt at the Government installation ["Government Mishandling exception"];

(3) Was sent by U.S. Postal Service Express Mail Next Day Service-Post Office to Addressee, not later than 5:00 p.m. at the place of mailing two working days prior to the date specified for receipt of proposals. The term "working days" excludes weekends and U.S. Federal holidays; or

(4) Is the only proposal received ["Only Proposal exception"].

54 FED. REG. 48978, 48994 (Nov. 28, 1989) (to be codified at 48 C.F.R. 52.215-10).

[22] EDI is defined as "a technique for electronically transferring and storing formatted information between computers utilizing established and published formats and codes, as authorized by the applicable Federal Information Processing Standards." 48 C.F.R. § 2.101 (2010).

15

targeted "to accommodate the use of electronic systems which *batch-process communications overnight* and therefore, *require receipt of information one day in advance to ensure timely delivery* to the designated address." *Id.* at 12,384 (emphasis added). This proposal was promulgated on July 3, 1995. 60 FED. REG. 34,735, 34,738 (July 3, 1995) (codified at 48 C.F.R. § 52.215-10).

Again, on September 12, 1996, another amendment to the FAR was proposed to allow consideration of proposals received after the agency's deadline, but only in the discretion of the contracting officer, thereby eliminating the existing "Late Proposal Rule." 61 FED. REG. 48,380, 48,381 (proposed Sept. 12, 1996). This proposed rule was never promulgated. Instead, during the following year, the "Government Control" exception was added to the FAR as a catch-all provision that was not limited to any specific delivery method:

> There is acceptable evidence to establish that it was received at the activity designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers, and the Contracting Officer determines that accepting the late offer would not unduly delay the procurement.

62 FED. REG. 51,224, 51,259-51,260 (Sept. 30, 1997) (codified at 48 C.F.R. § 52.215-1(c)(3)(i)(E)) (emphasis added).[23]

The last time the relevant portion of FAR 52.215-1 was modified was in 1999. In this version, only three exceptions applied to late proposals: the "Electronic Commerce" exception, the "Government Control" exception, and the "Only Proposal" exception.[24] 64 FED. REG. 51,837, 51,841 (Sept. 24, 1999) (codified at 48 C.F.R. § 52.215-1(c)(3)(ii)(A)).

As the regulatory history shows, in all versions of the FAR from late 1995 to the present, the "Electronic Commerce"[25] exception has required that proposals be submitted by 5:00 p.m. on

---

[23] In the September 30, 1997 amendment, the late proposal provision was moved from 48 C.F.R. § 52.215-10 to 48 C.F.R. § 52.215-1(c)(3). *See* 62 FED. REG. 51224, 51259-51260 (Sept. 30, 1997. This amendment also revised the language in the "Electronic Commerce" exception to provide an exception when the proposal was "received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals." *Id.*

[24] These modifications changed the "Government Control" exception, by replacing the phrase "activity designated for receipt of offers," with "Government installation designated for receipt of offers." 64 FED. REG. 51837, 51,841 (Sept. 24, 1999).

[25] "Electronic Commerce" is defined as "electronic techniques for accomplishing business transactions including electronic mail or messaging, World Wide Web technology, electronic bulletin boards, purchase cards, electronic funds transfer, and electronic data interchange." 48 C.F.R. § 2.1 (2010) (definitions). Contracting officers have discretion to authorize use of any of

the preceding business day.  *See* 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(1) (2010); 62 FED. REG. 51,224, 51,259-51,260; 60 FED. REG. 34735, 34738.  But, the *raison d'être* was concern about "electronic systems which batch-process communications overnight and therefore, require receipt of information one day in advance to ensure timely delivery to the designated address." 60 FED. REG. at 12,384.

For e-commerce methods of delivery that are not batch-delivered overnight, nothing in the text of FAR 52.215-1(c)(3)(ii)(A) or the regulatory history prohibits application of the "Government Control" exception, particularly since it was intended to be a general exception to be applied when a delay was caused by Government error.  *See* 64 FED. REG. 51,837 (Sept. 24, 1999) (FAR Councils indicating that the "Government Control" exception is intended "to permit consideration of late offers if the Government mishandled the offer").  Moreover, the "Government Control" exception is not limited to any particular method of delivery.  *Id.*

Today, e-commerce electronic communications are transmitted instantaneously in the ordinary course of business.  Accordingly, neither the text of FAR 52.215-1(c)(3)(ii)(A) nor the regulatory history supports a construction that would require an offeror, after relinquishing control of an e-mail proposal, to be responsible for the risk of late delivery when technical problems arise after an e-mail proposal reaches the e-gateway to a designated Government office.  For these reasons, the court has determined that, in cases of non-batch delivered electronic commerce, late proposals may be excused under any of the three exceptions in FAR 52.215-1(c)(3)(ii)(A).  It is particularly appropriate that the "Government Control" exception be available to offerors where there is "acceptable evidence" to establish that the offeror's e-mail proposal "was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers," as was the case here. *See* 48 C.F.R § 52.215-1(c)(3)(ii)(A)(2).

Therefore, assuming, *arguendo*, that Watterson's e-mail proposal was late, the court has determined that lateness is excused by the "Government Control" exception in 48 C.F.R § 52.215-1(c)(3)(ii)(A)(2).

---

these methods in Government contracting.  *See* 48 C.F.R. § 15.203 (2010) ("Electronic Commerce may be used to issue RFPs and to receive proposals, modifications, and revisions."); *see also* 48 C.F.R. § 4.501 (2010) ("The Federal Government shall use electronic commerce whenever practicable or cost-effective.").

17

   **3.**  **Assuming, *Arguendo*, That Plaintiff's E-Mail Proposal Was Late And FAR 52.215-1(c)(3)(ii)(A)(2) Does Not Excuse That Lateness, Whether Plaintiff Was Entitled To A One-Day Extension Of Time To Submit Its Proposal, Pursuant To FAR 52.215-1(c)(3)(iv).**

    **a.**  **The Plaintiff's Argument.**

Further, assuming *arguendo* that the "Government Control" exception does not apply, Watterson argues that FAR 52.215-1(c)(3)(iv) would excuse a late e-mail proposal. Pl. Mot. at 31. FAR 52.215-1(c)(3)(iv) provides:

> If an emergency or unanticipated event interrupts normal Government processes so that proposals cannot be received at the office designated for receipt of proposals by the exact time specified in the solicitation, and urgent Government requirements preclude amendment of the solicitation, the time specified for receipt of proposals will be deemed to be extended to the same time of day specified in the solicitation on the first work day on which normal Government processes resume.

48 C.F.R. § 52.215-1(c)(3)(iv); *see also CFS-INC, JV*, B-401809.2, 2010 CPD ¶ 85 (Comp. Gen. March 31, 2010) (allowing the proposal delivery date to be postponed for three days while agency offices were closed due to snow storm).

Watterson contends that the March 16, 2010 "e-mail storm" was an "emergency or unanticipated event" that was sufficiently severe to cause the entire Army Corps e-mail system to "come to a crawl" for "several hours." Pl. Mot. at 31 n. 38 (citing AR 415, 417).

    **b.**  **The Government's Response.**

The Government responds that FAR 52.215-1(c)(3)(iv) does not apply, because the e-mail storm was not an "emergency" or "unanticipated event" that "interrupted normal Government processes." Gov't Mot. at 11. Instead, this was a situation where an e-mail was "sent to many Department of Defense users, some of whom replied back to everyone on the e-mail's distribution list." Gov't Mot. at 11 (citing AR 415). Nevertheless, assuming that FAR 52.215-1(c)(3)(iv) applies, the text states that "the time specified for receipt of proposals will be deemed to be extended to the same time of day specified in the solicitation on the first work day on which normal Government processes resume." FAR 52.215-1(c)(3)(iv). Because "normal Government processes" resumed on the same day that the disruption began, the Government insists that proposals were still due on the original due date of March 16, 2010 by 12:00p.m. Gov't Mot. at 12.

    **c.**  **The Court's Resolution.**

The GAO has considered the "emergency" or "unanticipated event" exception in a number of cases, usually involving weather emergencies. *See, e.g.*, *Hunter Contracting Co.*, B-

402575, 2010 CPD ¶ 93 (Comp. Gen. March 31, 2010) (emergency or unanticipated event exception did not apply to a mailed proposal that was not delivered due to a snow storm, since the Government office was open and receiving proposals at the time the proposals were due); *CFS, JV*, B-401809.2, 2010 CPD ¶ 85 (Comp. Gen. March 31, 2010) (agency correctly gave only a one-day extension due to snowstorms, because normal Government activity resumed the following day); *Educ. Planning & Advice, Inc.*, B-274513, 96-2 CPD ¶ 173 (Comp. Gen. Nov. 5, 1996) (concluding that emergency or unanticipated event exception did not apply even though State required business to close at noon due to a hurricane, because four bidders successfully submitted bids and the Army was able to proceed with bid opening); *Unitron Eng'g Co. Inc.*, B-194707, 79-2 CPD ¶ 155 (Comp. Gen. Aug. 27, 1979) (emergency exception did not apply to a late delivery, even when a common carrier closed offices due to "an emergency at nearby nuclear electric generating plant," because mail delivery was normal, other offerors submitted bids, and the agency's workday was not affected).

The only relevant case concerning e-mail proposal delivery before the United States Court of Federal Claims is *Conscoop–Consorzia*, 62 Fed. Cl. at 241. In that case, the court held that the "emergency" or "unanticipated event" exception would apply if "normal Government processes" were interrupted. *Id*. The Administrative Record in that case, however, did not evidence any disruption in the Navy's electronic mail system. *Id.*

In this case, however, the Administrative Record evidences that at the same time that Watterson submitted its e-mail proposal, the Army Corps' mail server was "flooded" and e-mail delivery had "come to a crawl." AR 418. In some cases, e-mail was delayed for several hours. AR 417. An IT Specialist for the Army Corps recalled, "It was certainly something we don't normally see." AR 418. Therefore, the "mail storm" was an "unanticipated event [that] interrupt[ed] normal Government processes so that proposals cannot be received at the office designated for receipt of proposals by the exact time specified in the solicitation." FAR 52.215-1(c)(3)(iv).

It is true that at the time proposals were due, the Army Corps Office was open for business and proposals could have been delivered by hand. AR 405. The court, however, does not construe the phrase "proposals cannot be received" to mean that it must be impossible for the Government to receive proposals, before the "emergency" or "unanticipated event" exception applies. *See* 48 C.F.R § 52.215-1(c)(3)(iv).

The Government contends that since "normal Government processes" resumed on the same day the mail storm began, proposals were still due on the original due date of March 16, 2010 by 12:00 p.m. Gov't Mot. at 12. The Government, however, misreads 48 C.F.R. § 52.215-1(c)(3)(iv), because such an interpretation would not allow time extensions for disruptions of "normal Government processes" that occur at the time a proposal is due, if the "emergency" or "unanticipated event" abates later in the day. The text of 48 C.F.R. § 52.215-1(c)(3)(iv) does not compel an absurd outcome. If the "mail storm" were not ongoing at the time that proposals were due, this might be a closer question. But that was not the case. AR 417-18. The "first work day on which normal Government processes resume" necessarily is the following day, and, therefore,

under these circumstances, Watterson's proposal was not due until March 17, 2010 at 12:00 p.m. *See* 48 C.F.R § 52.215-1(c)(3)(iv).

Accordingly, Watterson's proposal was improperly eliminated from the competition, as the disturbance in the Army Corps' servers entitled Watterson to a one-day time extension.

### IV. CONCLUSION.

For these reasons, Plaintiff's October 1, 2010 Motion for Judgment On The Administrative Record is granted. The Government's November 1, 2010 Motion For Judgment On The Administrative Record is denied.

On or before April 30, 2011, Watterson will submit to the Government evidence of bid preparation costs. The Government will have 45 days to review Plaintiff's submission and file any objections with the court.

Entry of Judgment is deferred pending the court's final disposition regarding Watterson's bid preparation costs.

**IT IS SO ORDERED.**

                                        s/ Susan G. Braden
                                        **SUSAN G. BRADEN**
                                        **Judge**